**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15-cr-00452-5 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| EDWIN AMAYA | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Edwin Amaya is charged with one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). Amaya has moved to suppress evidence discovered as a result of what he claims was an unreasonable search and seizure. On June 27, 2016, this Court held a suppression hearing and, for the reasons explained below, the motion is now denied.

**BACKGROUND**

In or around September 2012, the FBI initiated an investigation into narcotics trafficking in the Chicagoland area. In connection with its investigation, the FBI received court authorization to intercept communications over a number of cellular telephones. By January 2014, the Government was intercepting telephone calls to various cell phone numbers used by Alfredo Acosta, who had become the primary target of the investigation. At the suppression hearing, FBI Special Agent Gustavo Martinez testified[1] that, at that time, the FBI had identified two addresses associated with Acosta: 2107 North Avers Avenue and 4032 West Irving Park Road. It was the FBI's understanding that Acosta resided at the North Avers address and used a unit within the West Irving Park building as a stash house.

---

[1] Agent Martinez was the only witness to testify at the suppression hearing. Thus, this account of the facts is based on his testimony.

Based on telephone calls intercepted on January 15 and January 16, 2014 (during which the callers spoke Spanish), the FBI believed that Acosta was preparing to receive ten kilograms of cocaine on January 16. That day, Agent Martinez was part of a team conducting surveillance of Acosta. There were initially two surveillance teams positioned at different locations. Agent Martinez's team was positioned at the North Avers location while another team was conducting surveillance at the West Irving Park building. During the surveillance, an agent and a linguist were in a wire room monitoring the wiretap on one of Acosta's cell phones. The agent and linguist used radio or "push to talk" to provide the surveillance team with a summary of what was happening during the calls as they were received.

At approximately 12:49 p.m., Acosta received a call from a Mexican telephone number (*i.e.*, a number beginning with 52, Mexico's country code). The caller told Acosta that he "was going to get ten" and that someone would be calling him. Based on that conversation and other intercepted calls—which involved Acosta planning deliveries to his customers and arranging for his courier to come to the West Irving Park building to make the deliveries for him—the FBI concluded that Acosta was going to receive and distribute the ten kilograms of cocaine that day. Acosta then received a call at approximately 12:52 p.m. The caller told Acosta that he would arrive in 40 to 45 minutes. The FBI understood that to mean that the person delivering the cocaine would arrive in that timeframe.

A little after 1:00 p.m., Agent Martinez's team—located at the North Avers property—observed Acosta get into his vehicle and drive to a grocery store. Acosta entered the store and came out a few minutes later with a Hefty-style bag. He then got back into his vehicle and drove away. Agent Martinez's team followed Acosta as he left the store and then drove to the West Irving Park location. Acosta parked his vehicle on the street to the immediate west of Irving Park

Road. He then walked southbound on that street (carrying the Hefty bag), went into the alley behind the West Irving Park building, and entered the building through the rear entrance.

Then, at approximately 2:02 p.m., the delivery person called Acosta and said he was five minutes away. Neither the caller nor Acosta discussed any details regarding the type of vehicle that would be making the delivery, how many people would be in the vehicle, or the exact location of the drop off. At approximately 2:10 p.m., the FBI surveillance team received information from the linguist in the wire room indicating that the delivery person had arrived at the location. Agent Martinez testified that the linguist got on the radio and frantically said, "he's there, he's there" or something to that effect. Between the time of the call stating that the delivery was five minutes out and the alert from the wire room that the delivery had arrived, the surveillance team did not observe any vehicles pull into the alley behind the West Irving Park building. But when they received the alert, the agents observed a gray Acura parked in the alley with its hazard lights activated, right near the door through which Acosta had entered the building. At the time, the Acura was the only vehicle there.

At approximately 2:11 p.m., Agent Martinez and another agent, William Roecker, approached the Acura. There were two occupants in the vehicle: Amaya was seated in the driver's side and an individual named Augustine Soberanis-Nunez was in the passenger seat. Agent Martinez approached the driver's side of the vehicle while Agent Roecker approached the passenger side. When Agent Martinez asked Amaya in Spanish what he was doing there, Amaya responded that he did not know. According to Agent Martinez, both Amaya and Soberanis-Nunez appeared nervous. Agent Martinez ordered Amaya to exit the vehicle and physically secured him in doing so, to prevent Amaya from fleeing or taking other action. During Amaya's exit from the vehicle, Agent Martinez had his weapon unholstered and held at his side in a safe position. He

3

testified that he had his firearm out for his own safety, as he did not know anything about Amaya or Soberanis-Nunez, either of whom could have been armed.

Once Amaya was out of the vehicle, Agent Martinez reholstered his weapon and performed a pat-down search to check Amaya for weapons. He did not find any. Agent Martinez then asked Amaya for identification. According to Agent Martinez, the identification Amaya produced did not appear authentic. As he described it, based on its overall quality it did not seem real. After obtaining Amaya's identification, Agent Martinez began looking in the vehicle for the ten kilograms of cocaine. Agent Martinez testified that during the search of the vehicle, Amaya was not free to leave the area—he had been detained. When he did not see any indication that the contraband was in the passenger compartment of the vehicle, Agent Martinez popped the trunk. There he observed a box of laundry detergent with a bag of laundry on top of it. In the box, underneath the bag, were what appeared to be gray bricks of cocaine. Agent Martinez took possession of the box containing the contraband and then, at approximately 2:20 p.m., told Amaya and Soberanis-Nunez that they were free to go. After the two men left together in the Acura, the FBI surveillance teams departed as well, since they did not want Acosta to be alerted that "they were onto him" and thereby compromise the wiretap.

The Government asserts that, based on the above-described circumstances, the FBI had probable cause to detain Amaya and Soberanis-Nunez and to search their vehicle. The Government further submits that even if only reasonable suspicion existed at the time the Acura arrived in the alley, Amaya's statement that he did not know why he was there gave the agents probable cause to search at that point. Amaya, on the other hand, contends that his detention amounted to an arrest and that the agents did not have probable cause to place him under arrest or search the vehicle.

**DISCUSSION**

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "[W]hen police conduct an unreasonable search or seizure, the exclusionary rule usually vindicates the Fourth Amendment's protections by kicking out the unlawfully obtained evidence." *United States v. Slone*, 636 F.3d 845, 848 (7th Cir. 2011). Ordinarily, seizures are reasonable only when supported by probable cause to believe an individual is engaged in criminal activity. *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014). The longstanding exception to the probable cause requirement arises under *Terry v. Ohio*, 392 U.S. 1 (1968), which authorizes brief investigatory detentions based on the less demanding standard of reasonable suspicion of criminal activity. *Id.* "Such a brief detention is permitted when it demands only a limited intrusion into an individual's privacy and rests on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Id.* (quoting *Terry*, 392 U.S. at 21). "[A]lthough reasonable suspicion is a less demanding standard than probable cause, such a stop requires at least a minimal level of objective justification and the officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* (internal quotation marks omitted).

"For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance[.]" *Huff v. Reichert*, 744 F.3d 999, 1006 (7th Cir. 2014) (internal quotation marks omitted). A *Terry* stop that is too prolonged or unreasonably intrusive becomes a de facto arrest that must be based on probable cause. *See United States v. Bullock*, 632

F.3d 1004, 1015 (7th Cir. 2011).[2] The appropriate inquiry is whether a reasonable person would feel free to terminate the encounter—that is, whether, taking into account all of the surrounding circumstances, the officers' conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. *Huff*, 744 F.3d at 1006. The Seventh Circuit has advised that "[a] seizure becomes an arrest when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with [a] formal arrest." *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999) (internal quotation marks omitted).

With respect to searches, "[o]rdinarily, warrantless searches are presumptively unreasonable." *United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013). "Cars, however, are exempted from the warrant requirement provided officers have probable cause to believe the car contains contraband." *Id.* "Probable cause to search a vehicle exists when, based on the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). In other words, "[p]robable cause to search exists where, based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010). When officers have probable cause to search a vehicle, "the search may extend to all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments, containers, packages, and trunks." *Richards*, 719 F.3d at 754 (internal quotation marks omitted).

---

[2] "[P]robable cause for an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *United States v. Sands*, 815 F.3d 1057, 1062 (7th Cir. 2015) (internal quotation marks omitted).

In making both reasonable suspicion and probable cause determinations, police officers are entitled to draw reasonable inferences from the facts based on their training and experience. *See Terry*, 392 U.S. at 27 (reasonable suspicion); *Richards*, 719 F.3d at 754 (probable cause).

## I.  Amaya's Detention

The Government contends that—based on the intercepted communications with Acosta, Acosta's presence inside the building at 4032 West Irving Park Road (into which he entered through the back door adjacent to the alley), the timing of the Acura's arrival, and the way in which the vehicle was positioned in the alley—the FBI had at least reasonable suspicion, if not probable cause, to detain the vehicle's occupants. Amaya disagrees, taking issue with the fact that law enforcement did not know the identity of the individual(s) delivering the cocaine, the make or model of the vehicle that was transporting the cocaine, the number of occupants in the vehicle, or any other specific identifying features that would distinguish the Acura from any other car that might have arrived at the building at that particular time.

Based on the evidence presented here, the Court finds that the FBI executed a constitutional *Terry* stop. It is true that "mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves [or arrives at] that property" and thus "is not enough to justify stopping everyone emerging from [or arriving at] that property." *United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2012). It is also true that "simply being in the presence of [or in propinquity to] others who are themselves suspected of criminal activity is insufficient standing alone to establish particularized suspicion for a *Terry* stop[.]" *Matz*, 769 F.3d at 523 (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). But here, law enforcement had more than mere suspicion of illegal activity at the West Irving Park building, and more than mere propinquity to Acosta. Based on the information from the wiretap, the agents knew (or at least

reasonably inferred)[3] that Acosta was expecting a drug delivery at a particular time. And they knew that at that particular time, Acosta was inside the building on West Irving Park Road. Further, at the moment the linguist in the wireroom reported that the delivery had arrived, there was a single car in the alley, pulled up next to the rear door that Acosta had used to enter the building. The Acura had its hazard lights activated, indicating that it would be there for only a short time—as opposed to, say, if it had been parked on the street. Those are all articulable facts that, taken together with the agents' reasonable inferences from those facts, warranted Amaya's detention.

Agent Martinez testified that he received training on the use of wiretaps, surveillance techniques, and investigative stops involving vehicles. And prior to this investigation, he had participated in several investigations involving surveillance along with the use of a wiretap. Based on that training and experience, Agent Martinez suspected that the Acura contained contraband. As noted above, law enforcement officers are entitled to rely on their training and experience in forming reasonable suspicion, and "[w]hen determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer[.]" *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). Taking Agent Martinez's training and experience into account, the Court concludes that the totality of the circumstances provided the minimal level of objective justification required by *Terry* and its progeny.

---

[3] Under the collective knowledge doctrine, when law enforcement officers are in communication with one another, as they were here, the knowledge of one officer can be imputed to the other officers. *See United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000); *see also Sands*, 815 F.3d at 1062 ("The collective knowledge doctrine allows officers within an agency or officers from different agencies working together to effectuate constitutionally permissible searches and seizures. In other words, the doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action.") (internal quotation marks omitted).

While the agents' lack of information regarding the vehicle and individual(s) making the delivery gives the Court some pause, the Seventh Circuit has advised that "a stop conducted in the face of ambiguity is permissible so long as it remains sufficiently probable that the observed conduct suggests unlawful activity." *United States v. Miranda-Sotolongo*, 827 F.3d 663, 669 (7th Cir. 2016). *See also Bullock*, 632 F.3d at 1012 ("Reasonable suspicion is a lower threshold than probable cause and does not deal with hard certainties, but with probabilities.") (internal quotation marks omitted). Despite the fact that the agents had no description of the delivery vehicle or the person(s) inside the vehicle, the intercepted communications and timing of events made it sufficiently probable that the Acura contained the ten kilograms of cocaine. In other words, while the agents' suspicion was not particularized based on a physical description of the vehicle or its occupants, their suspicion was particularized with respect to the vehicle's location and the timing of its arrival. "Reasonable suspicion has never been reduced to a mechanical formula, but embodies something less than probable cause and more than a hunch." *United States v. Wilbourn*, 799 F.3d 900, 909 (7th Cir. 2015) (internal quotation marks omitted). Agent Martinez and his team unquestionably had more than a hunch that the Acura was the drug delivery vehicle and were therefore entitled to stop it.

In *United States v. Askew*, 403 F.3d 496 (7th Cir. 2005), the Seventh Circuit found that there was reasonable suspicion to support a *Terry* stop in circumstances very similar to those under consideration here. In *Askew*, the FBI, through a cooperating witness, arranged a drug purchase to take place at a theater located in a busy strip mall. 403 F.3d at 499. The defendant agreed to meet the cooperating witness to make the exchange at 11:00 a.m. and advised that he would be in a white Cadillac. *Id.* When the cooperating witness called to tell the defendant that she had arrived at the strip mall, the defendant told her he was in front of the theater but in another

9

car (not a white Cadillac). *Id.* Law enforcement officers positioned outside of the theater identified a silver Hyundai Accent as the car carrying the defendant "based on the information provided by [the cooperating witness] and also due to the car's suspicious maneuvers—it was circling the lot as if its passengers were looking for someone." *Id.* at 500. The officers blocked the vehicle with theirs, removed the occupants (with guns drawn), and, once the defendant identified himself, placed him under arrest. *Id.* The court found that the FBI had effectuated a constitutional *Terry* stop (not an arrest) in the theater parking lot. *Id.* at 507.

The defendant in *Askew* argued that his behavior could not reasonably have alerted the officers that he, out of all the people in the strip mall parking lot, was the individual about to purchase drugs from the cooperating witness. *Id.* He characterized his behavior—riding in a car slowly circling the lot—as innocently looking for a parking space like many other patrons of the strip mall. *Id.* The court rejected those arguments, reasoning that:

> [T]he FBI agent in charge of the stop[] testified that he received information from [the cooperating witness] that [the defendant] was to arrive at the theater at 11:00 A.M. for the purpose of making a PCP buy. While waiting for [the defendant] to arrive, [the agent] was in contact with [the cooperating witness's] case agents, who were updating him as to [the defendant's] whereabouts based on [the cooperating witness's] contemporaneous phone conversations with [the defendant]. From th[o]se communications, [the agent] knew when [the defendant's] arrival was imminent and that he was in a car, although not the white Cadillac that [the defendant] originally claimed he would be driving. [The agent], who was assigned to investigate drug trafficking organizations, explained his decision to stop the Hyundai Accent: "It has been [my] experience that when you arrange a buy-bust for a certain location and then a car arrives at that location driving in what I would describe as a suspicious manner, clearly looking for someone in that parking lot, it's been my experience that that is the individual."

*Id.* at 507–08. On that basis, the Seventh Circuit found that the totality of the circumstances "firmly establishe[d] reasonable suspicion, if not probable cause, for the stop." *Id.* at 508.

Just as in *Askew*, the agents here knew that a drug deal was planned to take place at a specific time and at a particular place. In fact, law enforcement arguably had less to go on in

*Askew* than they did here, for the agents there had to pick one car out of many based on timing and the vehicle's movements. Here, there was only one car stopped at the relevant location at the time when the drug deal was expected to occur. Just like circling a parking lot and looking around is an innocent act, so too is stopping a vehicle in an alley and activating its hazard lights. But, as stated by the *Askew* court, "a pattern of behavior interpreted by the untrained observer as innocent may justify a valid investigatory stop when viewed collectively by experienced drug enforcement agents[.]" *Id.* (internal quotation marks omitted). Like in *Askew*, the timing here was key, and it is timing that sets this case apart from those in which the Seventh Circuit has found reasonable suspicion lacking because there was nothing specific connecting the defendant to criminal activity. *See, e.g., Bohman*, 683 F.3d at 865–66 (police may not stop a vehicle merely because it emerges from a site suspected of drug activity); *United States v. Johnson*, 170 F.3d 708, 719–20 (7th Cir. 1999) (police are not entitled to detain just anyone who walks out of an apartment generally suspected of hosting illegal activity).

Having decided that Amaya's initial detention was justified under *Terry*, the Court next must assess whether that detention became an arrest. As noted above, Agent Martinez testified that Amaya was not free to leave. Based on the circumstances, it seems that no reasonable person in Amaya's shoes would have felt free to terminate the encounter and go about his business. That said, the Seventh Circuit has noted that, "[f]or better or for worse, the trend [of granting officers greater latitude in using force during an investigatory detention] has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention." *United States v. Tilmon*, 19 F.3d 1221, 1224–25 (7th Cir. 1994). *See also Matz*, 769 F.3d at 526 ("Although the hallmarks of formal arrest such as applying handcuffs, drawing weapons, and

11

placing suspects in police vehicles should not be the norm during an investigatory detention, all of those measures have been recognized as appropriate in certain circumstances.").

The question is whether the approximately nine-minute encounter at issue here—during which Agent Martinez ordered Amaya out of the Acura, secured him in exiting the vehicle with his weapon unholstered, asked what he was doing there, and requested identification—constituted an intrusion or restraint of the degree that the law associates with a formal arrest. The Court concludes that it did not. "First, police officers are permitted to order a driver to exit his or her vehicle during the course of an investigatory stop." *Smith v. Ball State Univ.*, 295 F.3d 763, 769 (7th Cir. 2002). Second, if there is reasonable suspicion supporting a detention, the officers involved may use reasonable force to effect the detention. *United States v. Denney*, 771 F.2d 318, 321 (7th Cir. 1985). Here, Agent Martinez used some amount of physical restraint or force to secure Amaya in exiting the vehicle. Whether he guided or pulled Amaya out of the car, Agent Martinez's conduct was reasonable in that it was meant to effect the detention—that is, to prevent Amaya from fleeing the scene or taking some other action to interfere with the investigatory stop.

Further, "[t]he mere use or display of force in making a stop does not necessarily transform a stop into an arrest if the surrounding circumstances give rise to a justifiable fear for personal safety." *Tilmon*, 19 F.3d at 1226. Agent Martinez's securing of Amaya as he exited the Acura was justified not only by his effort to detain him but also by a reasonable fear for his safety, given the nature of the suspected criminal activity. Such fear also justified Agent Martinez in drawing his firearm. Agent Martinez confirmed during his testimony that he had his weapon drawn for his own safety, as he did not know anything about Amaya or Soberanis-Nunez aside from the fact that he suspected them of being involved in drug trafficking. Notably, Agent Martinez kept his weapon down in a safe position and never pointed it at Amaya. And once

Amaya was out of the vehicle, Agent Martinez reholstered his gun. For these same reasons, Agent Martinez was justified in patting Amaya down for weapons. In fact, the Seventh Circuit has held that drug-related seizures can warrant intrusive tactics because of their inherent danger. *See Askew*, 403 F.3d at 507–08 (noting that the inherent danger in stopping those suspected of drug trafficking, for which guns are known tools of the trade, in a public place where civilian lives might be at risk warranted the FBI's neutralization of the defendant by surrounding his car and approaching with weapons drawn). The tactics used by Agent Martinez here were not overly intrusive given the circumstances.

Nor did the detention ripen into an arrest following Amaya's exit from the vehicle. Agent Martinez simply asked Amaya what he was doing there and then requested identification. That single inquiry and routine request were reasonably related in scope to the circumstances that justified the stop in the first instance. Agent Martinez used routine investigative tactics in an effort to determine Amaya's identity and whether he was there to deliver drugs. Moreover, the entire encounter lasted only nine minutes. In that short timeframe, Amaya was not handcuffed, placed in a police car, or subjected to any of the other more intrusive measures generally associated with an arrest. *Cf. Ienco*, 182 F.3d at 524–25 (pointing to the following factors in concluding that the officers' conduct exceeded the bounds of *Terry* and resulted in an arrest: (1) the officers took defendants' (who were not suspected of drug activity) driver's licenses and, after a pat down revealed no weapons, removed the contents of their pockets and kept their wallets and licenses; (2) the officers retained one defendant's personal effects for a significant period of time and never told him he was free to leave; and (3) the officers held the defendants in a locked police car for approximately half an hour). In sum, the length of Amaya's detention "was limited to the

legitimate needs of the [agents] in conducting further investigation" and the manner of detention "was not unreasonable under these circumstances." *Bullock*, 632 F.3d at 1011.

## II. Search of the Vehicle

The question remaining to be decided is whether, after detaining Amaya and Soberanis-Nunez based on reasonable suspicion, Agent Martinez and his team had probable cause to search the Acura. As noted above, the Government maintains that probable cause existed prior to the detention—that is, when the vehicle parked in the alley and activated its hazard lights. That is a close call. In *Askew*, the Seventh Circuit suggested that the circumstances there may have given the officers probable cause to stop the car. *See* 403 F.3d at 508 ("The totality of the circumstances here firmly establishes reasonable suspicion, if not probable cause, for the stop."). And as noted above, the agents here arguably had more to go on than the officers in *Askew*. But regardless of whether probable cause existed at the time of the initial detention, the events that occurred thereafter justified Agent Martinez in searching the car.

Specifically, the agents' reasonable suspicion of criminal activity ripened into probable cause when Amaya gave an evasive answer regarding his reason for being in the alley and then provided what appeared to be counterfeit identification. Agent Martinez testified that when he asked Amaya what he was doing there, Amaya responded that he did not know. Amaya, on the other hand, provided an affidavit along with his motion to suppress in which he states that the question he was asked was "who are you looking for?" Either way, the "I don't know" response is evasive and suspicious. It was reasonable for the agents to believe that if Amaya had a legitimate reason for being in the alley, he would have articulated it. And if Amaya was not looking for Acosta—or anyone else—the agents would have been justified in expecting a response of "no one," or something along those lines (as opposed to "I don't know"). After failing to provide a

legitimate reason for his presence in the alley, Amaya handed over what appeared to be fake identification. Taken together with the circumstances that gave the agents reasonable suspicion to detain the car, this turn of events gave the agents probable cause to believe the Acura contained contraband.

The Seventh Circuit's decision in *United States v. Richards*, 719 F.3d 746 (7th Cir. 2013), is instructive. There, law enforcement was conducting surveillance at a house where an undercover police officer was scheduled to purchase a large amount of cocaine from a suspected high-level drug dealer. 719 F.3d at 750. When the undercover officer arrived at the house following a lead car, he backed his vehicle into the garage where the dealer's men loaded bags of what was later confirmed to be ten kilograms of cocaine into the trunk. *Id.* Approximately 20 minutes later, a silver pick-up truck arrived at the home. *Id.* The driver went into the house and returned to the truck shortly thereafter. *Id.* After departing, the truck met with another car—a gray Lexus—in a mall parking lot and then led the Lexus back to the house. *Id.* at 751. The Lexus backed into the garage, and the garage door closed. *Id.* About ten minutes later, the door opened and the Lexus drove away. *Id.* Law enforcement followed the Lexus and, after receiving confirmation that the substance loaded into the undercover officer's trunk had tested positive for cocaine, stopped and searched the car. *Id.* They found a backpack in the trunk of the Lexus containing about ten kilograms of cocaine. *Id.*

The Seventh Circuit noted that Richards had presented a close case but held that the facts and circumstances known to the officers at the time of the stop provided them with probable cause to believe the Lexus had picked up drugs during its stop at the house under surveillance. *See id.* at 755. Specifically, the court pointed to the following circumstances: (1) police knew that the undercover officer had purchased cocaine at the residence less than an hour before the Lexus

arrived; and (2) officers knew that the approach of the Lexus mirrored that of their undercover officer (both cars met another vehicle that led them to the residence and, after arrival, the lead car left as both the undercover officer and the Lexus backed into the garage where they remained for less than ten minutes). *Id.* The court held that, given that information, a reasonable officer could say with a fair probability that the Lexus had picked up drugs from the house. *Id.*

Just as in *Richards*, the agents here had no specific evidence linking Amaya (or the Acura) to Acosta. "But one can always point out informational gaps, and the probable cause inquiry asks what a law enforcement officer knew rather than what he did not." *Id.* (internal quotation marks omitted). And unlike *Richards*, where the police had no information indicating a second scheduled drug purchase that day, the agents here knew that a drug delivery was occurring at the exact time the Acura was parked in the alley with its hazard lights activated. Of course, information regarding the drop off vehicle or its occupants "would have solidified probable cause but [its] absence does not lessen the probable cause generated by" the Acura's arrival at Acosta's location (a suspected stash house) at the exact time a drug delivery was expected, Amaya's suspicious answer regarding his reason for being there, and his provision of what appeared to be fake identification. *Id.* While there are factual differences between this case and *Richards*, their similarity, taken together with the totality of the circumstances—considered in light of Agent Martinez's training and experience—gave the agents sufficient reason to believe that they had a fair probability of finding drugs in the Acura. *See also Williams*, 627 F.3d at 252 (holding that the totality of the circumstances—that the defendant met suspected drug dealers at a suspected stash house, where agents knew the dealers had carried out a drug transaction as recently as the day before, and that the defendant left the meeting carrying a shoebox in which he could conceal drugs—were sufficient to create probable cause).

Further, just as in *Richards*, the "well-settled proposition that mere proximity to suspected criminal activity does not, without more, generate probable cause" does not save the day for Amaya because the agents could reasonably conclude from his actions upon being detained that he "was not simply proximate to criminal activity but a participant in it." 719 F.3d at 757. The *Richards* court indicated that "[w]ere it not for the undercover officer's drug purchase within the hour and the strong similarity between the actions of the undercover officer and the gray Lexus," the police would have lacked probable cause. *Id.* at 758. In other words, the fact that the Lexus followed another car to the residence, or its mere association with that property, standing alone would not provide probable cause. *See id.* Here, there was no prior drug activity at the West Irving Park location to serve as a point of comparison. But there was a wiretap indicating that a drug deal was to take place at a precise location and time. And when Amaya arrived at that place, at that time, he acted in a suspicious manner. Thus, the combination of the factors giving rise to reasonable suspicion and Amaya's behavior once detained gave the agents a reasonable belief that drugs would be found in the Acura. The agents therefore had probable cause to search any part of the vehicle in which contraband could have been concealed, including the trunk.

## CONCLUSION

For the foregoing reasons, Amaya's motion to suppress is denied.

ENTERED:

Dated: December 16, 2016

_____
Andrea R. Wood
United States District Judge

17